case number 512-009, and we're opposed to attorney's decision. Good morning, Your Honors. Police, the Court, Counsel. This is a case that involves an injury from February of 2008, and I can't pass the most My name is Eric Hubbard. I represent the Respondent Appellant Freeburg Animal Hospital. This is an appeal from what was initially a 19B petition, and it's been passed in February of 2008, petitioner, an animal caretaker with the Freeburg Animal Hospital. She was outside walking a dog, came in, she slipped, and fell against the side of a door, a door jam, and sustained a, and I'm making gestures to my right, technically, it was the left shoulder, injured a left shoulder, and was subsequently treated for a shoulder injury. Now, the two questions at issue here were whether or not, not the shoulder injury, but a cervical injury was caused by this accident. And the second question was whether, and it's very much intertwined with the first, whether or not prospective medical care in the form of a disc replacement at the cervical C5, C6 level is medically reasonably necessary. What is critical to understand our position here is to get a very precise timeline of medical treatment. And the medical treatment as it unfolded here was that the petitioner was injured on the 24th of February. The next day she sought medical treatment with her family doctor. When she did, she didn't mention anything about her neck hurting at all. It was all about the shoulder. And then for essentially over the next three months, she visited her family doctor, Dr. Scheich, 14 times between February the 25th and May the 27th, and made no mention of any kind of neck pain whatsoever. When she finally did, she basically tied it in with the shoulder and said it was the very base of her neck into her shoulder that was still hurting. Well, you know, she saw the physical therapist March 11, two weeks after the injury. And the physical therapist wrote her diagnosis, the physical therapist's diagnosis was shoulder and neck pain. So it was reported by her to the physical therapist two weeks after the injury. And also in Dr. Scheich's office notes on June 3, you know, which would be, you know, not too long after the accident, he noted that she continued to have neck pain. The operative word being continued. The odd thing that is not consistent with that is, and I absolutely understand what you're saying by the word continued, and I didn't mean to gloss over that, but there's records before the 3rd of June, which I was just coming to, that mentions neck pain. What did Dr. Sprich have to say about all this? Dr. Sprich had to say, Dr. Sprich first saw the petitioner a year after her injury. Very interestingly, Dr. Sprich, when he first saw her, over a year post-injury, said nothing about a cervical condition. He attributed the cervical pain to essentially myofascial pain or referred pain from the shoulder up into the neck. He was basing this on what the intervening medical care, which was very extensive, had established. There were a number of EMGs, MRI, there were a lot of diagnostic testings, a lot of exams done in that intervening period, and based on that and based on his exam, over a year after the accident, he did not feel that she had a cervical condition. And yet he gave a causal connection opinion, did he not? He did, and he did that yet a year on down the road. And here's where the intertwining between my first and second issue really, this is the crux of this whole case. How he did that is he initially tried to have a discogram performed that would have replicated this pain. What they tied the pain down to, there's a lot of talk about some herniation at different levels, but the only level that we're looking at here is the C5, C6. He had a discogram performed, he referred her out to another physician to do the discogram. The discogram was negative. They could not replicate the pain from the C5, C6 right-hand side over onto the left shoulder. And there's an issue all along about that even being medically possible to have a right-hand annular herniation, an annular tear, have pain radiate down into the left side. That was negative. That was totally unsupported, any kind of diagnosis of radiculopathy from the right-hand side. All right, so are you saying, we could go through all the details, that Spritch's opinion is not supported by the medical evidence? Is that what you're telling us? Yes, and here's why it's not, because then he references a nerve root block. And the nerve root block, he says, was positive. He said it was either done, he could not recall in his deposition, evidence deposition testimony who did it, but he said definitively it was one of two doctors, Dr. Tom or Dr. Du. We have both of those doctors' medical records throughout the time periods that they would have done, throughout their whole treatment of the petitioner, and they don't mention this anywhere, that this was ever done. There's no record that that nerve root block was ever performed, nor is there any record in Dr. Du or Dr. Tom, when they do the procedure, that it was done, and then that report would be sent to Dr. Du. All right, well, just to summarize, let me see if we can cut to the chase here. You've got Spritch who provides an opinion, there's a causal connection between the February 2008 accident and the claimant's cervical condition. Emanuel says no, no way, okay? Then you've got Peoples. Peoples says I can't attribute it, that weighs in your favor. So you've got Spritch, you've got the claimant, you've got some medical records supporting the claimant. We can pick apart here and there. How is that against the manifest way of the evidence? Because that's really the critical question. All of this other detail, that's the critical question, and the corollary of that is why can't the commission decide the weight of the evidence? And what pulls the rug out of Dr. Spritch's opinion here, pulls the rug out from underneath his opinion, is the fact, and when he was asked in his deposition, what is the sole basis of, and I'm getting over into the prospect of medical care, what is the sole basis for your saying that this disc replacement is necessary, and he said it's based on the nerve root block. Did Dr. Tom and Dr. Du testify that there was no nerve root block? They did not. In other words, you're just saying because it didn't end up in medical records. What's in Tom's consultation notes from June the 9th, 2010, about a nerve root block? I don't have that note. He writes that the claimant thought that the selective nerve root block was significantly helpful in terms of alleviating her symptomatology, and he had written earlier that he asked a selective nerve root block to the C5-C6 nerve root on the left-hand side, and then spoke to the physician, and he was, quote, happy with the results. Your Honor, did you reference, was that Dr. Spritch's notes? No, Dr. Tom's notes. Okay. And wasn't Spritch the one that said the nerve root block was performed either by Tom or by somebody else? By Dr. Tom or Dr. Du. Right. And Tom writes in his notes that there was a nerve root block. It was performed by somebody other than him. He was happy with the results, and so was the claimant. So it appears that there is evidence of a nerve root block at C5-C6 on the left-hand side. And I'm in the somewhat embarrassing position to be wholly unfamiliar with that medical note. Take a look at his office consultation notes for June the 9th, 2010. And the other question I have for you is, if we accept the commission's finding of causation based on Spritch's testimony, then it necessarily follows, doesn't it, that the future medical is not against the manifest way of the evidence because wasn't Spritch the one that said only two choices, live with the pain or have the operation? I think that's correct to the extent that the opinion for the medical reasonable necessity of the disc replacement is supported by the nerve root block. And our position has been that, again, there is no record that that was ever performed apart from what Your Honor has mentioned and from what Dr. Spritch mentioned in his deposition. Dr. Spritch was so uncertain in his deposition at one point, he said, asking about this nerve root block, that he had asked for it and that's all he knew basically. And as he said now, do I know that that's the one they did, that test? And he said, I can't tell you that. Well, here's the whole problem that I'm having. And maybe it's just the standard of review that's troubling me. Obviously you're saying, and it has a certain intuitive appeal, that Spritch's opinion is medically flawed. That has to be your argument, correct? Correct. Is that not your argument? It is my argument. Okay. Who determines if Spritch's opinion is medically flawed and is credible and believable and should be given weight? Us or the commission? Well, of course the commission does, absolutely. So do we substitute our judgment for the commission on credibility? Absolutely not. That takes us to the manifesto. So how do you win the case? How I win the case is not on any one point. It's the mosaic of all the medical evidence that goes against. I like that. The mosaic? The mosaic. It goes against what is being said by Dr. Spritch. And when you look at that, you see you've got a number of physicians, neurologists. You have Dr. Barta, who did an EMG in July of 2008, five months after the accident. No evidence of any radiculopathy. You have another neurologist, Dr. Burrows, same thing, no evidence. You have Dr. Emanuel, Dr. Weimer, Dr. Peebles, Dr. Nagelski. When you look at what they are all saying, there is no compelling evidence that had them thinking there was any kind of radiculopathy. And one of the things that keeps coming up is it's a right-hand side and it's going over onto the left. Dr. Spritch himself said that he thought that maybe the annular tear was wide enough that that's why it was doing it. But he admits in his deposition that that was troubling as well. When you look at the timeline, when you look at her lack of complaints, when you look at, again, the whole mosaic of what we're dealing with here, that's where the manifest weight standard comes in. I don't take that lightly. In fact, we embrace it. I think manifest weight, you get to a certain point that you look at all the facts of the case and the question becomes, if not now, when? I want to correct something. The consultation note I was talking about was Spritch's note of June 9, 2010. He says, we testified that he talked to the doctor who performed the nerve block, but in his consultation note he says the claimant said she had nerve root block and that it significantly helped alleviating her symptoms. So she told him he had nerve root block in addition to, or according to him, in addition to him saying that he spoke to the doctor who actually performed it. I think that's offset handily by the fact that there is no medical record that these were ever his mention of it. There's no billing. Well, her mention of it, too. It's not only her. Her mention when you look at it. It was to him. You have a number of different procedures that were being performed on her around that period of time. There was a, I know there was talk of a facet joint injection. I believe that was performed. I hope I'm not misspeaking on that. There were other injections that were performed in the cervical region that she apparently did get some relief from, and I think she's simply confusing those. Why would he be referencing a nerve block that was never done? Why would he make all of this up? Why would the claimant? When his evidence deposition testimony is really taken apart, again, looking at the totality of the fact that there are no records to support this, I think he's confused. I think the doctor, to give him every benefit of the doubt, he's absolutely confused in his recollection. It's very hard to believe that a doctor, either Dr. Du or Dr. Tom, which Dr. Sprich definitively said it was one of the two, we have their medical records and evidence. Nothing's mentioned of it. There's no billing of this procedure ever happening. It's inconceivable that a doctor would not put something in his nose that's that significant of a procedure and it's very, very hard to believe that he wouldn't bill for it. So, again, when you look at the totality of everything here, we believe that the manifest weight of the evidence standard, which this court should be reluctant to conclude that the factual determination of the commission is against the manifest weight of the evidence. However, the court should not hesitate to do so when the clearly evident, plain and undisputable weight of the whole crux of this is the weight of the evidence offsetting Dr. Sprich's opinion. If you have no further questions, thank you very much. Mr. Cook. Good morning, counsel. My name is Bruce Cook and I represent the petitioner appellee Judy Newell. Judy Newell, back in 2008, worked for the Freeburg Animal Clinic. She worked there for five years. She was the lady that cleaned the dirty kennels. In February of 2000, she made just over minimum wage doing that. In February of 2008, she was walking a little dog on a freshly waxed floor when she fell and crashed into a door. She got prompt medical care. She has continued to treat. She's had two operations, one on her shoulder, one on her back. While she was convalescing, the respondent fired her from her job and cut off her health insurance. There's two issues in this case. The first one is the reasonableness and the necessity of the surgery that Dr. Sprich has prescribed. The other one is the causal relationship between the cervical injury and the work accident of February 2008. I'd like to start with the reasonableness of the surgery because it is the easiest to dispatch with. Dr. Sprich is a board-certified neurosurgeon in Belleville, Illinois. He's one of the four or five local doctors there. He graduated magna cum laude from Washington University, did his fellowship at Yale, and was trained at the National Hospital of England in London. He has testified unequivocally that the surgery that he prescribed is a reasonable and necessary means of treating for work-related injuries. The reason this issue is moot is because their own doctor, Dr. Peebles, the neurologist, he says that he can't say this surgery is inappropriate. He said that if the petitioner is in intolerable pain, it is appropriate. She should have it. The petitioner testified that she has pain every day. She's aware of the surgery. It's intolerable. She wants to have it. Nobody's disputing that that surgery is unreasonable. The big issue in this case is causation. And usually in an appeal, it's a question of credibility between a treating physician and a Section 12 examiner. But in this case, there's more to it than that. First off, Dr. Sprick testifies unequivocally, again, to a reasonable degree of medical certainty that her cervical injury relates to the work accident at issue in this case. Now, they have Dr. Emanuel. Judge Stewart asked counsel a question about a physical therapy note. That's been glossed over in every aspect of this case, and it wasn't responded to now. Page 24 of the respondent's brief says, For over three months after the accident, the complainant complained only of shoulder pain and made no mention of back pain. Consistent with this, in the months following the accident, there is no medical diagnosis of a cervical condition. When claimant finally referenced the cervical discomfort in June of 2008, the complaints were vague and ill-defined. Their examiner, Dr. Emanuel, whose report was sent to every other examiner in this case, testifies in page 11 of their brief. Dr. Emanuel noted that in the first three months following the injury, the complainant made only complaints of pain in her shoulder. That's not the evidence in this case. That's not true. Two weeks after the accident, on March 11th of 2008, at her initial evaluation for physical therapy, Judy Newell went in and she told the therapist that she has pain in her shoulder and she has pain in her neck. The treatment that she had that day, two weeks after the accident, included palpitation to her shoulder, sorry, palpitation to her neck on the left side, the same area that she has complained of hurting since this accident happened. She also testified that before this accident she'd never had a problem with pain in her neck and, in fact, there's no medical records to that effect. So are you saying then that Emanuel's opinion is sort of based on a flawed factual foundation? Absolutely, and it's tainted every other examiner they've hired because they sent Emanuel's report. Emanuel based his opinion, by the way, Emanuel's an arm specialist, not a neurosurgeon, and was there primarily to see her for the shoulder. And Sprick testified that there's an overlapping of the symptoms in the shoulder and the cervical spine. Emanuel, in his report, bases his opinions on his statement that for the first three months following the injury, Clement made only complaints of pain in her shoulder. That's just not true. She complained about cervical pain. Let's assume you undermine Emanuel's opinion, you have Sprick. Peoples sort of doesn't help you, obviously. I mean, he doesn't give a definitive opinion against the claimant, but he says, I can't attribute it, correct? Correct. But then he says, ah-ha, what about Burroughs and Barta looking at objective medical tests and studies say they don't see the evidence here? I think that that says that there's nothing conclusive that shows, and there's been a problem with the diagnostic in this case. I'll admit that. But Sprick says that based upon the nerve conduction test that he believes that there is an annular tear in the MRI. And Sprick does say that it would be in the left side because of the length of the annular tear. The diagnosis hasn't been real clear. I will tell you that Sprick testified that because her health insurance was terminated, and they've disputed this case, he's had a problem getting all the tests that he wants. He has had a problem getting things. It might explain why perhaps the nerve conduction test wasn't done in a form that he said somebody's got to pay for it. Perhaps because nobody was paying for it, that would be an explanation of why Dr. Tom and Dr. Sprick talked about it on the telephone. And Dr. Sprick wasn't wishy-washy that it was performed. He was clear. My opinion on the Emanuel conclusion is that everyone, and they sent it to, and also he talked about Weimer not having a comment on the neck. Those guys treated her for a shoulder problem. That was the primary response. And when Sprick first saw her, he thought all the symptoms were referable to the shoulder. Then when she had the operation and the symptoms didn't resolve, then they took a look at the neck and got back to her. And that's how she got back there. The Emanuel conclusion that's based on, I've been sitting here today and I hear, especially in Mr. Parika's case, when you said, you know, no treatment for two years afterwards. You asked about that. How important it is on the temporal relationship between the injury and the manifestation of symptoms. And in this case, you have two weeks after the accident, a lady who'd never had neck pain before, suddenly going to a physical therapist and telling her, my neck hurts, after she took a violent fall, holding a dog into a doorjamb where she hit her upper side. That lady. To me, and also on people's, he said he can't isolate it too clearly. Then all these guys, all these doctors are basing their opinions on a belief that this lady didn't have any pains until, his respondent notes in their brief, June the following year. That's not true. You've got the continuing statement by Dr. Shay and then you've got the physical therapy records that nobody has acknowledged in this case at all. I mean, in their brief, they specifically represent to the court. So obviously it's your position there is sufficient evidence in the record to support the award, correct? Absolutely, sir. Just out of curiosity, what's your thought as to where the report is for this nerve block test? My theory on that is that nobody was paying for this and that Dr. Sprick called Dr. Tom and asked Dr. Tom to do it and that Dr. Tom called him and gave him the results. No one's paid this lady's medical bills. All of her treatment has been, and they haven't got the test they wanted. I think there also, by the way, is a certain audacity with criticizing how a diagnostic is done when you're not willing to pay for it. She was given health insurance through her employment. They terminated that while she was sick. And then to come up here and criticize that the doctor wasn't thorough enough for a test that you're not paying for, and I think should have paid for, I think that takes some audacity. I will conclude by saying that I think that this is a very simple case. This is a lady that had a clearly identifiable accident. It went to the doctor the next day. They complained of pain in her shoulder and her arm. She saw a board-certified neurosurgeon who's testified unequivocally that everything is related to the fall she had at work. He's testified that the surgery that he has prescribed is reasonably necessary and related to the accident. The arbitrator heard the evidence. The commission heard the evidence and ruled unanimously that the petitioner prevailed. Judge McGlynn in St. Clair County heard the appeal, and he too confirmed the award. I think they all got it right, and I thank you for your time. Thank you, Mr. Cook. Mr. Hubbard, you may reply. Thank you very much. A couple of things briefly. As to the physical therapy note, again, that's very troubling to me that I didn't catch that, and I apologize, but I think that the operative thing there is that there was no medical treatment. There was only a physician for three months, over three months. There was nothing said to her family doctor that I was able to find in his notes after a thorough, sour event. It mentioned any kind of neck pain. The physical therapist would have reported to Dr. Shea, right? I don't know. It's in the doctor's code for the physical therapist. I don't know. I assume he ultimately got the note, but I couldn't remember. But what's very important here is Ms. Newell's counsel is saying basically that Dr. Emanuel somehow tainted the opinion of all these other doctors who were unable to find any sort of radiculopathy whatsoever, and that's frankly just ridiculous. These doctors all can think for themselves. They can all draw their own conclusions. They can all perform their own exams and render their own treatment, and it has to be assumed that that was what was done. I agree with counsel that the accident was very straightforward and was very clearly identifiable. I totally disagree that this is a clearly identifiable cervical injury because it's just not. It's very, very convoluted at best as to what the actual problem is. The only thing they could find is a right-side herniation. All these other doctors are saying these EMG tests are showing no evidence of radiculopathy. So, again, the overwhelming weight, the swell of the evidence is against the position of Dr. Sprich. I think the other thing that's very worth noting here as far as the petitioner goes, there were four doctors who noted symptom magnification in the petitioner, which significantly calls into question her reporting of her symptoms. It was Dr. Emanuel, Dr. Mikulski, Dr. Peebles, and Dr. Tom at various points that are addressed in my brief. So, with that said, if there are no further questions, we would ask that the decision of the Circuit Court, which affirmed the decision of the Commission, be reversed. Thank you. Thank you, Mr. Cover. The matter will be taken under advisement and written disposition will issue. The Court will stand in recess.